**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CAPITAL ONE FINANCIAL CORPORATION, | |
| *Plaintiff*, | |
| v. | C.A. No. _____ |
| JENNIFER DELOYD, | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

## VERIFIED COMPLAINT

Plaintiff Capital One Financial Corporation ("Capital One" or the "Company"), by its undersigned attorneys, respectfully submits this Verified Complaint for breach of contract against Defendant Jennifer DeLoyd as follows:

## NATURE OF THE ACTION

1. Jennifer DeLoyd was a highly paid executive at Capital One, National Association, Capital One's principal operating subsidiary, where she was responsible for managing a critical team of about 50 employees. She developed strategy for Capital One's Retail Bank, including its online checking and debit products, and figured out how best to compete against other online consumer banking services providers, including Chime.

2. Because of her access to Capital One's most sensitive confidential business information, DeLoyd was among the half of one percent of Capital One's employees who were asked to sign a non-compete agreement. She chose to do so in exchange for generous consideration, including Capital One's promise to pay her a full year's salary during her one-year non-compete period. And with her sophisticated business background and law degree, she certainly understood her obligations.

1

3.      DeLoyd, however, engineered a plan to breach her agreement, hoping Capital One would let it slide.  She asked her supervisor to eliminate her role, making her eligible for yet another year's worth of severance pay.  She falsely explained that she planned to use the money (twice her annual salary) to take time off to deal with personal issues.  At that time, however, she appears to have already secretly accepted a competitive role at Chime and taken steps, including manipulating a Slack message, to cover that up.  When she eventually disclosed to Capital One that her real plan was to run business strategy for Chime, including for its principal online checking product that competes directly with Capital One, Capital One reminded her that her non-compete agreement would prohibit this.  It offered to work with her to agree on a different, non-competitive role at Chime, but she ignored Capital One's outreach.

4.      DeLoyd did not take time off for personal matters as she falsely claimed she planned to do.  Instead, immediately upon DeLoyd's departure, Chime publicly announced that it had hired her as its new Vice President of Corporate Strategy.  Chime's own press release touts her prior experience at Capital One and describes the services she performed for Capital One as her primary qualifications for the new job.

# Chime appoints Jen DeLoyd as VP of Corporate Strategy

Chime Team • October 1, 2024

Formerly of Capital One and Bridgewater, the corporate strategy leader brings extensive expertise in strategic initiatives, operations, and customer experience to Chime.

Chime® is thrilled to announce the appointment of Jen DeLoyd as the new Vice President of Corporate Strategy. Jen joins Chime with a wealth of experience developing and implementing strategic initiatives across analytics, operations, product, marketing, customer experience, talent, sales, and account management. Her track record in achieving growth and efficiency targets while building high-performing teams will be invaluable at Chime.

In her new role, Jen will drive Chime's corporate strategy by identifying member needs and addressing them with innovative solutions that drive member engagement and business growth. Jen will report directly to Chime's COO, Mark Troughton.

"We are incredibly excited to welcome Jen to Chime. Her strategic vision and passion for building high-performing teams will be instrumental as we continue to scale and innovate."
Mark Troughton, COO at Chime

Before joining Chime, Jen spent nearly four years in leadership roles at Capital One, driving initiatives that resulted in 20% year-over-year growth in checking and debit accounts and established the finance giant as a leader in retail banking. Prior to her time at Capital One, Jen was a Senior Management Associate at Bridgewater, where she supervised a team supporting the CEO and board of directors to define, implement, and assess strategic initiatives and special projects, drove key product and operations re-designs, and improved investment associate hiring yields by 10-15% while defining recruiting pipeline and sourcing analytics. In her earlier career, Jen held leadership roles at McKinsey, Groupon, and the social media marketing platform Main Street Hub, where she pioneered diversity initiatives, oversaw operations and analytics, and led significant projects in the banking, tech, and consumer goods sectors.

"I have admired Chime for several years, frequently finding myself asking, 'How are they doing that?' The opportunity to disrupt the financial sector in a mission-driven, innovative way is incredibly compelling to me. I look forward to working with the talented team at Chime to drive significant growth and continue serving our members with big ideas that make a real difference."
Jen DeLoyd, VP of Corporate Strategy at Chime

chime.com/newsroom/news/chime-appointed-jen-deloyd-as-vp-of-corporate-strategy/

5.      To prevent irreparable harm to the Company and to enforce DeLoyd's freely chosen and bargained-for contractual obligations, Capital One respectfully asks this Court to enjoin DeLoyd from further violating her non-compete agreement.

## PARTIES

6.      Plaintiff Capital One is a Delaware corporation with its principal place of business at 1680 Capital One Drive, McLean, Virginia 22102.

7.      Defendant DeLoyd is a natural person who is domiciled in the state of Connecticut.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.

9.      This Court has personal jurisdiction over DeLoyd pursuant to the forum-selection clause in her Non-Competition Agreement, through which DeLoyd irrevocably submitted to the non-exclusive jurisdiction of the federal and state courts located in the State of Delaware for any "claims, causes of action or disputes arising out of or related to this Agreement," which includes breach of the non-competition covenants contained therein.  *See* Ex. 1 ¶¶ 12-13.

10.      Venue in this Court is proper because the parties contractually agreed that this Court would serve as the non-exclusive venue for this dispute.  Ex. 1 ¶ 13.

## STATEMENT OF FACTS

### I.      Capital One Is A National Leader In Financial Services.

11.      Capital One was founded with a mission to revolutionize the banking industry through information and technology.  Since its establishment 30 years ago, Capital One has grown into an essential provider of banking services, credit cards, and auto loans in the United States. The Company serves more than 100 million customers across a diverse set of businesses and is among the largest digital retail banks in the United States.  Capital One maintains multiple

divisions, including credit cards, auto finance, commercial banking, and most relevant here, consumer banking.

12.     Part of Capital One's consumer banking services includes its Retail Bank.  Capital One's Retail Bank business encompasses products that include checking accounts, savings accounts, and debit products.  The Retail Bank business also encompasses its physical assets, including cafés, ATMs, and brick-and-mortar branches.  Retail banking is an important aspect of Capital One's business.  Last year, the Company's overall deposit growth was "primarily driven by [its] national banking strategy," including its "national brand and marketing strategy, cafés, and tech / digital investments."[1]

## II.     Chime Is A Direct Competitor Of Capital One.

13.     The majority of Capital One's total accounts are digital, and more than 90% of its new customers sign up for checking accounts online.  It has account holders in all 50 states and Washington, D.C.  In fact, Capital One has the largest number of "digital-only" customers in the United States.

14.     Chime is a financial technology company that partners with banks to provide online banking services.[2]  Chime itself is not a bank, but it sells digital accounts that are FDIC-insured through Stride Bank, N.A. or The Bancorp Bank, N.A.[3]

15.     Chime and Capital One are direct competitors in the digital banking space.  Both Chime and Capital One offer customers an online checking account option.  Chime's fully web-

---

[1] *Annual Report, Capital One* 60 (2023), https://ir-capitalone.gcs-web.com/static-files/3381e479-cf44-4a85-a0f6-b7d8d30c2a31; *see also id.* at 3 (attributing "a strong year of financial performance" to "strong growth in credit cards and retail banking").

[2] *Everything You Need to Know About Banking with Chime* (last accessed Oct. 3, 2024), ENTREPRENEUR, https://www.entrepreneur.com/business-news/everything-you-need-to-know-about-banking-with-chime/395534.

[3] *How Does Chime Make Money?* (last accessed Oct. 4, 2024), CHIME, https://www.chime.com/blog/how-does-chime-make-money/.

based "Chime Online Checking Account" is its main product.[4]  Chime markets this account as an option for customers seeking the utility of a checking account but who wish to avoid the restrictions associated with checking accounts offered by traditional banks.  To that end, in connection with its checking services, Chime offers early payroll access, fee-free overdrafts, fee-free ATMs and a Chime debit card.[5]

16.     In comparison, "Capital One 360" is Capital One's checking account option. Though Capital One *is* a bank, its 360 Checking Account contains none of the restrictions often imposed by conventional banks.  To the contrary, exactly like Chime, Capital One 360 offers customers 24/7 mobile banking, early paycheck, fee-free overdrafts, and fee-free ATMs.[6]  Like Chime, Capital One 360 also offers a debit card.

---

[4] *Chime Online Checking Account* (last accessed Oct. 4, 2024), CHIME, https://www.chime.com/checking-account/.
[5] *Id.*
[6] *360 Checking Account* (last accessed Oct. 4, 2024), CAPITAL ONE, https://www.capitalone.com/bank/checking-accounts/online-checking-account/.



Chime.com    360 Checking Account, CapitalOne.com

17.    The strikingly similar offerings between the two companies' account options make it clear that Chime and Capital One compete for customers' business in the checking account space.

18.    The similarities between the two checking account services are widely acknowledged in industry publications and discussed among the general public.[7] Likewise, Capital One's own market research has confirmed that Chime is a direct competitor for both primary checking market share and debit card ownership market share.

---

[7] *See Next-Gen Banking: 7 Exciting Chime Alternatives* (last accessed Oct. 4, 2024), ACCRUE SAVINGS, https://www.accruesavings.com/post/chime-alternatives (listing Capital One 360 as "one of the best alternatives to Chime"); *The 6 Best Alternatives to Chime* (last accessed Oct. 4, 2024), WISE, https://wise.com/us/blog/online-banks-like-chime (similar); *see also Chime to 360 Checking* (last accessed Oct. 4, 2024), REDDIT, https://www.reddit.com/r/CapitalOne_/comments/195bbzz/chime_to_360_checking/.

19.     In addition to competing for customers and market share, Chime and Capital One compete for talent.  In fact, in March 2024, for example, Chime contacted Daniele Andreini, the Head of Marketing, Analytics and Product Strategy at Capital One—one of DeLoyd's former supervisors—about the role that DeLoyd has accepted at Chime.

**III.    DeLoyd Executed A Non-Competition Agreement In Exchange For Valuable Consideration And Access To Capital One's Confidential Information.**

20.     Based on the particular facts of an individual employee's role and their access to the Company's highest level of confidential and proprietary competitive information, Capital One requires some of its highest-level employees to sign non-competition agreements.  These narrowly tailored non-competition agreements are necessary because such senior employees are in a position to, and do, acquire highly confidential information that would be damaging to Capital One if divulged to a competitor.  Capital One is incredibly selective about which employees are bound by non-competition agreements; out of the Company's 55,000 employees, only about 280 individuals (approximately one half of one percent) are subject to non-competition provisions, each of which is narrowly tailored.

21.     DeLoyd was one such senior employee.  DeLoyd agreed to her "Non-Competition Agreement" ("NCA") on February 5, 2021, as she was preparing to shift to a sensitive role with Capital One's Retail Bank.  The NCA, which Capital One entered into "on its own behalf and on behalf of its affiliates and subsidiaries," is attached to this Complaint as Exhibit 1 and incorporated by reference.  The NCA is governed by Delaware law.  Ex. 1 ¶ 12.

22.     The NCA "advised and encouraged" DeLoyd "to consult with independent legal counsel before executing this Agreement."  Ex. 1 ¶ 17.  According to DeLoyd's LinkedIn, she herself has a law degree from the Boston University School of Law.

23.     In the NCA, DeLoyd agreed that for a period of one year following her departure

from Capital One, she would not provide any entity services (1) "that are the same as or substantially similar" to those she performed for Capital One during the 24-month period prior to her termination date and (2) that compete with any business for which she "performed such services" during that 24-month period.  Ex. 1 ¶ 1(c).

24.     Under the NCA, DeLoyd's "Non-Competition Covenant" applies "to all activity performed throughout the United States," and DeLoyd acknowledged and agreed "in light of Capital One's nation-wide business activities and [her] work on such nation-wide activities, this geographic scope is narrowly tailored to protect Capital One's legitimate business interests."  Ex. 1 ¶ 1(c).

25.     In consideration for her NCA, she received (and acknowledged that she received) from Capital One "Trade Secrets and other Confidential Information regarding Capital One's operations, methods, plans and/or strategies, among other things, which, if not maintained in confidence, will threaten Capital One's competitive advantage over those who do not know it and will cause immediate, substantial and irreparable harm to Capital One's business interests."  Ex. 1 ¶ 1(b).

26.     As further consideration, DeLoyd received a relatively modest monetary payment when she returned the executed NCA to the Company.  Ex. 1 ¶ 3.

27.     As reflected in the NCA's Preamble, DeLoyd's continued employment as a highly compensated executive also served as consideration for her execution of the NCA.

28.     As yet further consideration, Capital One agreed to pay an "Incentive Payment" equal to DeLoyd's base salary at the time of separation if Capital One terminated her employment for any reason other than her death, disability, or cause.  Ex. 1 ¶ 2(a), (b).

29.     DeLoyd also specifically acknowledged that "any actual or threatened action by

[her] in violation of this Agreement shall void Capital One's obligations" to pay the Incentive Payment and would "require" that she "immediately forfeit or repay . . . all amounts paid" under the NCA.  Ex. 1 ¶ 8.  She further acknowledged that if she breached the NCA, she would have to "pay to Capital One all of its costs and expenses, including without limitation reasonable attorneys' fees, incurred by Capital One in successfully enforcing the terms of this Agreement."  *Id.*

30.     DeLoyd agreed to "submit to the personal jurisdiction and venue of any state or federal court located within the State of Delaware as a non-exclusive forum for resolution of claims, causes of action or disputes arising out of or related to" the NCA.  Ex. 1 ¶ 13.

**IV.     DeLoyd Works As A Senior Leader At Capital One And Becomes Intimately Familiar With The Company's Business Plans, Growth Strategies, And Other Confidential Information, Including Its Plans For Competing Against Chime.**

***DeLoyd Spends The Majority Of Her Tenure At Capital One As Head of Checking, Deposit Product Acquisitions, and Consumer Insights.***

31.     DeLoyd joined Capital One in late 2020 as Vice President of Corporate Strategy and has since worked in a variety of senior leadership roles at the Company.  She worked as Head of Checking, Deposit Product Acquisitions, and Consumer Insights from February 2021 through March 2024.  Most recently, from April 2024 until her separation, DeLoyd was Capital One's Head of Retail Bank Market Strategy and Analytics.  These are all high-ranking positions in which DeLoyd contributed to the development of Capital One's nationwide strategy.

32.     As Head of Checking, Deposit Product Acquisitions, and Consumer Insights, as of 2024, DeLoyd reported to Andreini, the Head of Financial Products and Marketing at Capital One.  Andreini, in turn, reports to Celia Edwards Karam, the President of Capital One's Retail Bank.

33.     In her role, DeLoyd spearheaded nationwide strategy for checking and debit products, which form the core of Capital One's Retail Bank business.  By DeLoyd's own account on her LinkedIn, she held major, "bank-wide" responsibilities, leading a large team of about 50

analysts, researchers, and project/process managers responsible for the profit and loss, strategy, and analytics of Capital One's Retail Bank, including its checking and debit products.

> **Head of Checking, Deposit Product Acquisitions and Consumer Insights**
> July 2021 - April 2024 (2 years 10 months)
> New York, New York, United States
>
> Led a 55+ person team of business analysts, data analysts, market researchers, and project/process managers responsible for our Checking/ Debit product P&L, strategy and analytics. I also own bank-wide responsibly for digital account opening, consumer/market research and insights, customer experience, economic datamarts and product valuations.

34.     DeLoyd, as the Head of Checking, Deposit Product Acquisitions, and Consumer Insights, managed four primary workstreams:

(1) ***Product strategy***.  DeLoyd and her team were responsible for deciding which features or offers Capital One would provide to its customers.  For instance, they evaluated new functions for Capital One's mobile apps, piloted the "360 Checking Account" program, and introduced new checking account and debit options for young adults.

(2) ***Account opening***.  DeLoyd and her team managed various aspects of the consumer experience of opening a checking account at Capital One, including digital account launches, funding, and onboarding.

(3) ***Valuations***.  DeLoyd and her team used value modeling methods to analyze Capital One's client relationships.  Value modeling measures the lifetime value of any relationship a customer has with Capital One.  The valuations process is highly proprietary.  This workstream is a horizontal function, and it is not limited to Capital One's checking and debit business.

(4) ***Market research***.  DeLoyd and her team analyzed the performance and competitiveness of the Company's various offerings, including checking accounts, savings accounts, and Capital One café locations nationwide.  DeLoyd and her team also regularly evaluated the offerings of competing businesses, including Chime, to inform Capital One's own marketing strategies and target growth areas.  This workstream is another horizontal function, and it is not limited to Capital One's checking and debit business.

35.     DeLoyd's role was nationwide.  Because Capital One's consumers are nationwide, her role involved developing Capital One's nationwide strategy.

36.     DeLoyd was deeply involved in Capital One's competitive analysis of Chime.  For instance, from March to June 2023 alone, DeLoyd received several highly sensitive internal reports on Checking strategy that call out Chime by name approximately two dozen times and discuss at length Chime's market share and business development efforts.  And in July and September 2023, DeLoyd received confidential reports from an external consultant to Capital One regarding Checking expansion strategies, which compared Capital One's performance against Chime's on a number of metrics and discussed Chime's business at length.

***Capital One Moves DeLoyd To Retail Bank Market Strategy And Analytics Role, And DeLoyd Asks For Her Own Role To Be Eliminated.***

37.     In March 2024, around three years into DeLoyd's role as Head of Checking, Deposit Product Acquisitions, and Consumer Insights, Capital One made the business decision to move her to a new position:  the Head of Retail Bank Market Strategy and Analytics.  This was a horizontal move, as both roles were Vice President positions.

38.     As Head of Retail Bank Market Strategy and Analytics, DeLoyd reported to Jennifer Windbeck, Head of Bank Channels & Operations.  Windbeck, like Andreini, reports to Karam.

39.     As Head of Retail Bank Market Strategy and Analytics, DeLoyd was responsible for leading strategic initiatives related to Capital One's physical branches, cafés, and ATMs.

40.     Despite the importance of her new role as Head of Retail Bank Market Strategy and Analytics, DeLoyd was unhappy with the change.  She expressed dissatisfaction to Windbeck that she had not been promoted to a *Managing* VP position in her previous role on Andreini's team.  After she learned that a Managing VP role had been filled by another individual, DeLoyd reached out to Windbeck and urgently asked for a one-on-one meeting on July 3, 2024.  DeLoyd insisted

on meeting with Windbeck just before Windbeck left for vacation, noting that her request was time sensitive.

41.     At that meeting, DeLoyd requested that her own role—Head of Retail Bank Market Strategy and Analytics—be eliminated.  DeLoyd asked for a severance package in connection with this request.

42.     Immediately upon Windbeck's return from vacation two weeks later, DeLoyd pressed Windbeck about the role elimination.  Two days later, Windbeck agreed to eliminate her position.  Windbeck asked DeLoyd to stay in the role until the end of the calendar year, but DeLoyd wanted to leave after two weeks.  DeLoyd explained that she needed time off to address personal issues.

43.     During these conversations, Windbeck reminded DeLoyd of her non-competition obligations, pursuant to her NCA signed by DeLoyd in February 2021.  *See infra* ¶¶ 20-30.  DeLoyd initially denied having signed such an agreement.

44.     Capital One showed DeLoyd the NCA, which she acknowledged that she had signed.

45.     DeLoyd appears to have secretly already accepted a position with Chime and taken steps to prevent Capital One from learning this.  On July 15, she was discussing an upcoming conference with a Capital One colleague and initially wrote in a Slack message:  "I actually probably won't 'officially' be saying I'm *at Chime* yet by [the date of an upcoming conference]," before editing the message to remove the mention of "Chime" and instead writing, "I actually probably won't 'officially' be saying I'm *in a new role* yet."

46.     DeLoyd asked Windbeck a series of questions about hypothetical examples of what she could or could not do under the NCA.  Windbeck advised DeLoyd to speak with Capital One's Employee Agreements team about the issue.

47.     Ultimately, Windbeck and DeLoyd agreed that DeLoyd's last day at Capital One would be September 26, 2024, following a Board of Directors meeting for which DeLoyd and her team had been preparing.  In reliance on DeLoyd's anticipated compliance with her non-compete obligations, and not knowing that DeLoyd had apparently already accepted a competitive position at Chime, Capital One continued to trust DeLoyd to work on a confidential strategy presentation to be given to Capital One's Board at its September 2024 meeting.

48.     DeLoyd also continued to work closely with an external strategic consultant and an internal working group in analyzing Capital One's Retail Bank's cost strategy for future years based on comparisons between Capital One and its competitors.  This analysis related to Checking strategy, as well as Capital One's physical presence.  In discussing this work with DeLoyd, one team member observed over Slack that the market research provided by the external strategic consultant gave the team insight into "[t]he primary reason" that customers "choose [Capital One] over Chime."

49.     On July 25, 2024, DeLoyd received a series of text messages from her Human Resources Business Partner reading, "I think you will not need to worry about future strategy roles with regards to your non compete / I would say it will focus more directly on checking / So you don't need to stay away from Banking per se but definitely avoid working on anything related to checking."  The HR employee did not tell DeLoyd that she could accept strategy positions that compete with Capital One's Retail Bank business, which includes checking and debit, under the terms of her NCA.  Instead, her aim was to communicate to DeLoyd the possibility of pursuing

strategy roles *outside* of checking—certainly not strategy for a competitor (like Chime) whose main business is checking.

50.     On July 31, 2024, representatives from Capital One's Human Resources team formally notified DeLoyd that her position had been eliminated.  During this meeting, Human Resources again reminded DeLoyd of her non-competition obligations, informed DeLoyd that Capital One intended to enforce her NCA, and stressed that DeLoyd could not accept a strategy role in checking given her contractual obligations.

## V.     DeLoyd Departs Capital One, Joins Chime, And Refuses To Honor Her Obligations Under The Non-Competition Agreement.

51.     On or around September 11, 2024, DeLoyd traveled to California, mentioning to one Capital One colleague that she was "in [California] meeting with some folks."  Though DeLoyd provided no explanation for her trip, upon information and belief, she traveled to California to speak with representatives at Chime, which is headquartered in San Francisco, California.



52.     The following day, September 12, DeLoyd had a regular monthly call with Human Resources, during which DeLoyd asked if she could take a corporate strategy job elsewhere. Human Resources reminded her that she could not take any strategy position that overlapped with checking, given her previous role at Capital One, and directed DeLoyd to work with Employee Agreements to understand potential conflicts.

53.     Several days later, on September 17, 2024, DeLoyd messaged a Capital One Human Resources representative regarding a "job req[uisition]" she wished to "review with the employee agreements team."

54.     On September 17 and again on September 18, Capital One provided DeLoyd with a copy of her services inventory document.  As a matter of course, Capital One prepares a "services inventory" for departing employees who have executed NCAs with Capital One to evaluate and identify that employee's services in the past 24 months at Capital One in order to analyze any NCA issues.  Services inventory documents are created without regard to any specific position that the departing employee is hoping to accept.

55.     On September 19, DeLoyd informed Employee Agreements that she was considering "a head of corporate strategy role at Chime."  Given that Chime's principal business is online checking, there is no doubt that a position heading corporate strategy for Chime, on its face, runs afoul of the restrictions in DeLoyd's NCA.

56.     And on September 25, 2024, DeLoyd informed members of the Human Resources team that she "plan[ned] to accept the ["Corporate Strategy Executive"] role at Chime"—a position which, according to the job description that DeLoyd shared, would involve working directly with Chime's leadership to "drive pivotal strategic, operational, and business development initiatives, as well as shape the overall long-range strategy for the business."  Ex. 2 (Chime Job Description). The role calls for an executive who can "bring structure to cross-functional teams," "communicate at all levels of the organization," and "design and execute comprehensive company level strategies across numerous business lines."  *Id.*

57.     According to the job description, Chime's "Corporate Strategy Executive" will collaborate with leadership in driving growth initiatives and value in core, adjacent, and new

markets; design long-term corporate strategies; provide insights on business trends, enterprise, and business strategy; maintain a sophisticated understanding of the overall enterprise and competitive landscape; create and execute business plans; conduct strategic value-based assessments, and "[p]artner closely with Product, Corporate Development, Business Development and Finance to develop and enterprise wide [*sic*] point of view."  Ex. 2.

58.    Given that Chime fundamentally is a checking account provider, the position is remarkably similar to DeLoyd's former role as Head of Checking, Deposit Product Acquisitions, and Consumer Insights at Capital One, where her responsibilities likewise included collaborating with leadership to drive growth initiatives and value, designing long-term corporate strategies, providing insights on business trends, enterprise, and business strategy, maintaining a sophisticated understanding of the overall enterprise and competitive landscape, creating and executing business plans, conducting strategic value-based assessments, and partnering with others throughout Capital One to develop an enterprise-wide point of view.

59.    In her NCA, DeLoyd agreed not to accept roles, in the year following termination of her employment, that would require her to provide services that are the same as or substantially similar to those she provided to Capital One.  Ex. 1 ¶ 1(c).  Here, the conflict is clear.  As an example, the Chime role will require her to provide services related to "business modeling and valuation models," which fit squarely within DeLoyd's duties in the Retail Bank business at Capital One.

60.    More generally, given that online Checking forms the core of Chime's business, it is impossible that DeLoyd could accept the Chime position (as drafted) *without* providing services that compete with Capital One's Retail Bank business.

61. Nonetheless, on September 26, 2024, DeLoyd sent an email to her Capital One colleagues, informing them that it was her last day with the Company.  Notably, she did not announce that she was going to work for Chime, one of Capital One's competitors.

62. That day, Nicholas Armstrong, Human Resources Director for Talent Acquisition, reached out to DeLoyd.  He informed her of the Company's perspective that the "broad scope" of DeLoyd's proposed Chime position "would, on its face, require that [she] perform services substantially similar to the services [she] provided for Capital One for the two (2) years prior to [her] termination of employment."  Ex. 3 (9/26-9/30 N. Armstrong Email Thread).  At this point, Capital One had repeatedly reminded DeLoyd that she would need to ensure that any new role did not run afoul of her NCA—first during DeLoyd's role elimination discussions in July, again during DeLoyd's meeting with Human Resources on September 12, and now, via Armstrong's email.

63. Armstrong specifically explained that the proposed Chime position included "responsibilities to provide Chime, a competitor to Capital One's Retail Bank business, strategy services for checking and debit products, as well as business and valuation modeling."  Ex. 3. Armstrong emphasized that Capital One "expects" DeLoyd would not take the Chime position as described, but that the Company would be open to her proceeding in a different strategy role excluding all prohibited services related to checking and debit products.  *Id.*

64. DeLoyd refused to budge, questioning whether Capital One would suffer any damages and claiming that she was not in possession of any confidential information.  *See* Ex. 3.

65. In response, Armstrong reiterated Capital One's understanding that "the core of Chime's enterprise business is checking and debit products" and that the job description, on its face, requires DeLoyd to provide "prohibited services . . . that compete with [Capital One's] Retail Bank business."  Ex. 3.  As to DeLoyd's point on damages, Armstrong highlighted the provision

in her NCA, which "entitles Capital One to [her] compliance with the promises [she] made therein, and to seek an injunction to enforce those promises." *Id.*

66.     To date, DeLoyd has not responded, leaving Capital One with no option but to seek relief from this Court.

67.     On September 30, 2024, DeLoyd signed her Severance Agreement with Capital One.  The Agreement requires DeLoyd to return all Capital One property, including computers and mobile devices issued to her for work.  The Agreement also provides for a severance package equal to one year of DeLoyd's regular base pay, subject to DeLoyd's compliance with the separation agreement.  The amount is payable in one lump sum no later than 60 days after Capital One's receipt of the signed contract.

68.     All told, were DeLoyd to fully comply with the terms of her NCA, she would be entitled to both her severance package *and* her Incentive Payment under the NCA—for a total of two years' worth of her annual salary.  And, without losing the right to these payments, DeLoyd also would have been free to accept a non-competitive role elsewhere.  And yet DeLoyd chose a path that put her in breach of her NCA.

## VI.     Chime Announces DeLoyd's Hiring, Touting Her Capital One Leadership Experience.

69.     Despite Capital One's warnings and repeated attempts to reach a compromise, DeLoyd forged ahead in violation of her NCA.

70.     On October 1, 2024, Chime announced, via press release, that it had appointed DeLoyd as its new Vice President of Corporate Strategy. Ex. 4 (Chime Press Release).  In the first sentence of the announcement, Chime touts her experience at "Capital One," mentioning her "extensive expertise in strategic initiatives, operations, and customer experience."  *Id.*  Chime's press release further notes that DeLoyd brought a "wealth of experience developing and

implementing strategic initiatives across analytics, operations, product, marketing, customer experience, talent, sales, and account management." *Id.*

71.     The press release specifically calls out DeLoyd's prior position at Capital One and her leadership roles at Capital One "driving initiatives that resulted in 20% year-over-year growth in *checking and debit accounts*" (emphasis added).  Ex. 4.  Chime also refers to Capital One as a "leader in retail banking"—directly highlighting the portion of Capital One's business which is directly competitive with Chime's enterprise.  *Id.*

72.     Chime's own language leaves no room for doubt:  DeLoyd's acceptance of this new role constitutes a breach of her contractual obligations.

## VII.    If DeLoyd Is Permitted To Continue Employment At Chime, The Harm To Capital One Will Be Severe And Irreparable.

73.     Chime is one of Capital One's key competitors, jockeying for the Company's customers and talent.  Chime has a clear motive, and now, the opportunity to take advantage of DeLoyd's information about Capital One's strategy and capabilities.  And given the commonality of her roles at Chime and Capital One, it would be virtually impossible for DeLoyd to serve as Chime's Vice President of Corporate Strategy without using the confidential information she absorbed at Capital One.  She was deeply involved in analyzing both Capital One's and Chime's retail banking business, which includes checking and debit, and planning how Capital One could best compete with Chime.  It would be impossible for DeLoyd, even with the best of intentions, to avoid relying on that confidential information in her new role planning how Chime could best compete with Capital One.  It is therefore inevitable that DeLoyd will use Capital One's confidential information to do her new job.  Such use and disclosure poses a unique harm to Capital One.  Further, although her Severance Agreement required her to do so, DeLoyd has not yet returned Capital One's property, including a mobile device and a laptop.

## COUNT I – BREACH OF CONTRACT:
## VIOLATION OF NON-COMPETITION AGREEMENT

74.     Capital One repeats and realleges the foregoing paragraphs as if fully set forth herein.

75.     The NCA is a valid, binding, and fully enforceable contract between Capital One and DeLoyd.

76.     During her employment with Capital One, DeLoyd executed an NCA in exchange for:  (1) access to Capital One's confidential information; (2) an incentive payment equal to her base salary if Capital One were to terminate her employment for any reason other than her death, disability, or cause; (3) an additional modest monetary payment; and (4) continued employment.

77.     The NCA remains valid and enforceable.  It has a reasonable geographic scope and duration, is narrowly tailored to protect Capital One's legitimate interests, and imposes minimal hardship on DeLoyd because it not only provides her with valuable consideration but leaves her free to work in her chosen field so long as she avoids providing services that are the same as or substantially similar to services she provided Capital One during the two-year look-back period and that are competitive with such services.

78.     Capital One has performed all of its obligations under the NCA.

79.     By working for a direct competitor almost immediately after departing from Capital One, DeLoyd flagrantly and transparently breached her NCA.  DeLoyd's new employer, Chime, competes directly with Capital One in the retail banking business, which includes checking and debit.  Additionally, DeLoyd is serving Chime in a role that is the same as or substantially similar to the role she held at Capital One during the two years prior to her termination date.  With each passing day DeLoyd continues to work at Chime, she continues to be in breach of her NCA.

80.    As a direct and proximate result of DeLoyd's breaches, Capital One has suffered and will continue to suffer irreparable harm.

81.    Capital One has no adequate remedy at law.

## PRAYER FOR RELIEF

82.    WHEREFORE, Capital One respectfully requests that the Court enter an order and judgment against DeLoyd as follows:

A)    Awarding Capital One temporary, preliminary, and permanent injunctive relief, including but not limited to:  enjoining DeLoyd from violating the NCA by providing prohibited services to Chime for the period of time required by the NCA, subject to tolling for her breaching conduct;

B)    Awarding Capital One actual and compensatory damages in an amount to be determined at trial;

C)    Awarding Capital One pre- and post-judgment interest, as applicable;

D)    Awarding Capital One its costs, expenses, and reasonable attorneys' fees pursuant to the NCA; and

E)    Awarding Capital One such further and other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

83.    Capital One hereby demands a jury trial.

OF COUNSEL:

Jason C. Schwartz*
Jacob T. Spencer*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC  20036-5306
(212) 955-8500
jschwartz@gibsondunn.com
jspencer@gibsondunn.com

Anna Casey*
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923
(214) 698-3476
acasey@gibsondunn.com

*/s/ Timothy R. Dudderar*
Timothy R. Dudderar (#3890)
John A. Sensing (#5232)
Tyler E. Cragg (#6398)
POTTER ANDERSON & CORROON LLP
1313 N. Market Street, 6th Floor
Wilmington, DE  19801-6018
(302) 984-6000
tdudderar@potteranderson.com
jsensing@potteranderson.com
tcragg@potteranderson.com

*Attorneys for Plaintiff*
*Capital One Financial Corporation*

* Application for admission *pro hac vice* forthcoming

October 10, 2024